

**FILED**

Dec 31 2015, 9:15 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEYS FOR APPELLANT

John David Hoover
Michael J. Blinn
Hoover Hull Turner LLP
Indianapolis, Indiana

ATTORNEY FOR APPELLEE

Jerry Garau
Garau Germano, P.C.
Indianapolis, Indiana

IN THE

# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| John Collip, M.D., <br> *Appellant-Defendant,* <br><br> v. <br><br> Vickie Ratts on behalf of Robert A.J. Ratts, deceased, and Little Creek Family Health Center, LLP, <br><br> *Appellees-Plaintiffs* | December 31, 2015 <br><br> Court of Appeals Case No. 49A05-1501-CT-1 <br><br> Appeal from the Marion Superior Court <br><br> The Honorable Theodore M. Sosin, Judge <br><br> Trial Court Cause No. 49D02-1012-CT-55368 |

**Baker, Judge.**

[1] Dr. John Collip had a contractual relationship with Dena Barger, who is a nurse practitioner and owns her own medical practice. Pursuant to their Collaborative Practice Agreement (CPA), Dr. Collip was to collaborate with Barger and oversee her prescriptive authority. Specifically, he was to review at least 5% of her charts on a weekly basis to evaluate her prescriptive practices. On March 30, 2009, Robert Ratts, one of Barger's patients, died as a partial result of mixed drug intoxication.

[2] Dr. Collip brings this interlocutory appeal challenging the trial court's order granting partial summary judgment in favor of Vickie Ratts, Ratts's mother, on her medical malpractice claim. The trial court held as a matter of law that Dr. Collip had a duty to Ratts even though he had never treated Ratts as a patient.

[3] The Indiana General Assembly has enacted a complex and detailed statutory scheme that authorizes nurse practitioners to provide medical services. We infer from the language of the statute that one of the purposes of this legislation was to provide the public with greater access to affordable healthcare. The legislature also sought to ensure the safety of the public by requiring that when prescribing legend drugs, nurse practitioners must be overseen by a licensed physician. We hold as a matter of law that physicians who undertake this responsibility owe a duty to the nurse practitioner's patients to fulfill their contractual obligations with reasonable care. We affirm and remand.

# Facts[1]

Under Indiana law, a nurse practitioner cannot prescribe legend drugs[2] without a collaborative practice agreement with a licensed physician. Dr. Collip and Barger entered into the CPA in 2006. Pursuant to the CPA, Barger practiced under the direction and supervision of Dr. Collip; Barger paid Dr. Collip for his oversight. Dr. Collip admitted that he knew that if he failed to do what was required of him under the CPA, Barger's patients could be placed in danger. He knew that he was obligated to ensure that Barger was providing appropriate care, including prescriptive care, to her patients. Although Dr. Collip had no ownership interest in, or employment affiliation with Barger's clinic, his name appeared with Barger's at the top of the clinic's preprinted prescription forms and on clinic stationery.

The CPA required Dr. Collip to review at least 5% of Barger's charts on a weekly basis and to document Barger's prescribing practices. Dr. Collip admittedly never complied with these requirements. He did engage in a limited review of Barger's notes,[3] and this review caused him to become concerned about the amount of narcotics that Barger was prescribing to her patients. He

---

[1] We held oral argument on December 3, 2015, in Indianapolis. We thank counsel for both sides for their able written and oral presentations.

[2] "Legend drugs" include "any human drug required by federal law or regulation to be dispensed only by a prescription, including finished dosage forms and active ingredients subject to 21 U.S.C. 811 through 812." Ind. Code § 25-26-14-7.

[3] As noted above, Dr. Collip was required to review at least 5% of Barger's charts. According to counsel at oral argument, he never reviewed a single one; instead, he reviewed a limited selection of her notes.

suggested that she attend a narcotic-prescribing seminar and occasionally commented on the combination or amounts of medications she was prescribing. Dr. Collip did not follow up regarding the seminar. He knew that he held the "keys to the drugstore" for Barger and that if he terminated the CPA, she would no longer be permitted to prescribe drugs at all. Appellant's App. p. 153. Dr. Collip did not take any steps to terminate the CPA.

[6] In addition to the CPA with Barger, Dr. Collip had collaborative practice agreements with eleven to twelve other nurse practitioners. He was also working ninety hours per week as a family practice physician.

[7] Ratts, a patient of Barger, was a high-risk patient with a history of depression, suicide attempts, and polysubstance abuse. From January through March 2009, Barger prescribed multiple medications for Ratts, including Lortab (a combination of hydrocodone and acetaminophen), methadone, Wellbutrin, lithium, and Xanax. Ratts died on March 30, 2009, and an autopsy revealed that the cause of his death was acute bronchopneumonia complicating mixed drug interaction. Dr. Collip never treated Ratts, never saw Ratts in consultation or in any other circumstances, and never received or reviewed any of Ratts's medical records before this litigation.

[8] On October 24, 2013, Vickie Ratts (Mother) filed an amended complaint against Dr. Collip, Barger, and Barger's clinic. On September 11, 2014, Mother filed a motion for partial summary judgment against Dr. Collip; the motion argued solely that Dr. Collip owed a duty to Ratts as a matter of law. Dr.

Collip filed a cross-motion for summary judgment, arguing that, as a matter of law, he did *not* owe a duty to Ratts. Following briefing and oral argument, the trial court issued an order on December 9, 2014, summarily granting Mother's summary judgment motion and denying Dr. Collip's cross-motion. The trial court found that its decision was a case of first impression and sua sponte certified the order for interlocutory appeal. Dr. Collip now appeals.

## Discussion and Decision

## I. Standard of Review

[9] Our standard of review on summary judgment is well established:

> We review summary judgment de novo, applying the same standard as the trial court: "Drawing all reasonable inferences in favor of . . . the non-moving parties, summary judgment is appropriate 'if the designated evidentiary matter shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Williams v. Tharp,* 914 N.E.2d 756, 761 (Ind. 2009) (quoting T.R. 56(C)). "A fact is 'material' if its resolution would affect the outcome of the case, and an issue is 'genuine' if a trier of fact is required to resolve the parties' differing accounts of the truth, or if the undisputed material facts support conflicting reasonable inferences." *Id.* (internal citations omitted).

> The initial burden is on the summary-judgment movant to "demonstrate [ ] the absence of any genuine issue of fact as to a determinative issue," at which point the burden shifts to the nonmovant to "come forward with contrary evidence" showing an issue for the trier of fact. *Id.* at 761–62 (internal quotation marks and substitution omitted). And "[a]lthough the non-moving party has the burden on appeal of persuading us that the

grant of summary judgment was erroneous, we carefully assess the trial court's decision to ensure that he was not improperly denied his day in court." *McSwane v. Bloomington Hosp. & Healthcare Sys.,* 916 N.E.2d 906, 909–10 (Ind. 2009) (internal quotation marks omitted).

*Hughley v. State,* 15 N.E.3d 1000, 1003 (Ind. 2014). Although summary judgment is rarely appropriate in negligence cases, the existence of duty is generally a matter of law for the courts to decide. *E.g.*, *King v. Ne. Sec., Inc.*, 790 N.E.2d 474, 484 (Ind. 2003).

## II. Duty

[10] Initially, we note that Dr. Collip spends much of his brief arguing that, in a medical malpractice context, if the defendant does not have a physician-patient relationship with the plaintiff, then the defendant owed no duty to the plaintiff as a matter of law. Dr. Collip maintains that the CPA did not create a physician-patient relationship between himself and Ratts. This argument is a red herring, as Mother concedes that there is no physician-patient relationship. As such, *Harper v. Hippensteel*, the case primarily relied upon by Dr. Collip, is inapposite because the *Harper* Court determined that the mere existence of a CPA does not create a physician-patient relationship. 994 N.E.2d 1233, 1242 (Ind. Ct. App. 2013). As Mother does not make that argument, *Harper* does not apply to this case. Mother insists that this case sounds in tort and must be analyzed under general tort principles, and we agree.

## A. *Webb v. Jarvis* factors

The seminal case in determining the existence of a duty is our Supreme Court's decision in *Webb v. Jarvis*, 575 N.E.2d 992 (Ind. 1991). In *Webb*, as in the case before us, our Supreme Court considered whether a physician had a legal duty to a third party to whom he had not provided any medical treatment. *Id.* at 994 (person shot by patient for whom doctor had prescribed anabolic steroids brought suit against the physician). In analyzing whether a legal duty existed, our Supreme Court articulated three factors to consider: (1) the relationship between the parties; (2) the reasonable foreseeability of harm to the person who was injured; and (3) public policy concerns. *Id.* at 995.[4] The three factors are to be balanced together rather than considered to be three distinct and necessary elements. *Cram v. Howell*, 680 N.E.2d 1096, 1097 (Ind. 1997).

## 1. The relationship between the parties

Here, the only link between Dr. Collip and Ratts was the CPA between Dr. Collip and Barger. It is well established, however, that "Indiana Law does not preclude liability in tort for personal injury merely because privity is absent." *Harper v. Guarantee Auto Stores*, 533 N.E.2d 1258, 1262 (Ind. Ct. App. 1989). Where privity is absent, "one must have actual knowledge that a third person

---

[4] Dr. Collip argues that *Webb* does not apply because this analysis is limited to "those instances where the element of duty has not already been declared or otherwise articulated." *N. Ind. Pub. Serv. Co. v. Sharp*, 790 N.E.2d 462, 465 (Ind. 2003). Dr. Collip returns to his argument that it is well settled that a physician-patient relationship is a prerequisite to a duty in a medical malpractice case. Inasmuch as *Webb* itself involved a medical malpractice claim by a third party against a doctor with whom he did not have a physician-patient relationship, we do not find Dr. Collip's argument persuasive.

might reasonably be affected in order to impose a duty." *Webb*, 575 N.E.2d at 996. Furthermore, "we have recognized that a duty may be owed to a beneficiary of the consensual relationship, akin to that of a third party beneficiary of a contract, where the professional has actual knowledge that the services being provided are, in part, for the benefit of such third persons." *Id.*

[13] In this case, a physician voluntarily entered into a contract with a nurse practitioner, pursuant to which he agreed to provide oversight of her prescriptive practices. The gravamen of such a contract is the protection of the nurse practitioner's patients. And indeed, Dr. Collip has admitted that the services he agreed to provide under the CPA were necessary for the protection of Barger's patients. Appellant's App. p. 153. In other words, he had actual knowledge that his services were being provided for the benefit of those third parties and that those third parties might reasonably be affected by the manner in which he performed his services. Notwithstanding the lack of privity, therefore, we find that this factor weighs in favor of the existence of a duty.

## 2. The reasonable foreseeability of harm to the person injured

[14] In analyzing the foreseeability component of our duty analysis, "we focus on whether the person actually harmed was a foreseeable victim and whether the type of harm actually inflicted was reasonably foreseeable." *Webb*, 575 N.E.2d at 996. In other words, we impose a duty only where a reasonably foreseeable victim is injured by a reasonably foreseeable harm. *Id.* at 997.

[15] A nurse practitioner, while a highly qualified medical professional, is not a physician. Barger did not go to medical school or participate in a residency program. As such, our legislature has determined that nurse practitioners may prescribe legend drugs only when under the supervision of a physician. One of the apparent reasons for this policy, which we infer from the language of the relevant statutes, was to ensure the safety of the patients of nurse practitioners. If the supervising physician fails to adequately perform his or her oversight duties, it is eminently foreseeable that the nurse practitioner's patients could suffer harm.

[16] Indeed, in this case, Dr. Collip admitted that his failure to adequately supervise Barger, including his failure to review her charts as required by the CPA, could result in harm befalling her patients. Appellant's App. p. 45. Ratts, as one of her patients, was a reasonably foreseeable victim of Dr. Collip's alleged negligence. And the harm that befell Ratts—death as a partial result of mixed drug of intoxication—is precisely the type of harm one would expect to occur if Dr. Collip had negligently performed his obligations under the CPA. Consequently, we find that this factor weighs in favor of a duty.

## 3. Public policy

[17] As observed by the *Webb* Court, "'Duty is not sacrosanct in itself, but is only an expression of the sum total of those considerations of policy which lead the law to say that the plaintiff is entitled to protection.'" 575 N.E.2d at 997 (quoting *Prosser & Keeton on Torts* § 53 (5th ed. 1984)).

As with any piece of legislation, there are multiple policy reasons that our General Assembly has decided to enact the set of laws at issue in this case. To provide the public with greater access to affordable healthcare, the legislature has authorized nurse practitioners[5] to provide medical services to their patients. Ind. Code ch. 25-23-1; 848 Ind. Admin. Code 4-2-1. But as noted above, as nurse practitioners are not physicians, the legislature has determined that physician oversight is required. More specifically, the General Assembly has required that if a nurse practitioner seeks to prescribe legend drugs, he or she must fulfill a number of conditions. We infer from the language of the relevant statutes that one of the purposes behind these conditions is to ensure the safety of the patients of nurse practitioners. 848 I.A.C. 5-1-1. Among those conditions is a requirement that the nurse practitioner:

> [s]ubmit[] proof of collaboration with a licensed practitioner in the form of a written practice agreement that sets forth the manner in which the advanced practice nurse and licensed practitioner will cooperate, coordinate, and consult with each other in the provision of health care to patients. Practice agreements shall be in writing and shall also set forth provisions for the type of collaboration between the advanced practice nurse and the licensed practitioner and the reasonable and timely review by the licensed practitioner of the prescribing practices of

---

[5] "Nurse practitioners" is part of a broader category defined as "advanced practice nurses." Ind. Code § 25-23-1-1(b). We limit our discussion to nurse practitioners here because that is the only category of advanced practice nurses at issue in this case, but our analysis applies equally to the other types of advanced practice nurses enumerated in the statutory definition.

the advanced practice nurse. Specifically, the written practice agreement shall contain at least the following information:

(A) Complete names, home and business addresses, zip codes, and telephone numbers of the licensed practitioner and the advanced practice nurse.

(B) A list of all other offices or locations besides those listed in clause (A) where the licensed practitioner authorized the advanced practice nurse to prescribe.

(C) All specialty or board certifications of the licensed practitioner and the advanced practice nurse.

(D) The specific manner of collaboration between the licensed practitioner and the advanced practice nurse, including how the licensed practitioner and the advanced practice nurse will:

    (i) work together;
    (ii) share practice trends and responsibilities;
    (iii) maintain geographic proximity; and
    (iv) provide coverage during absence, incapacity, infirmity, or emergency by the licensed practitioner.

(E) A description of what limitation, if any, the licensed practitioner has placed on the advanced practice nurse's prescriptive authority.

(F) A description of the time and manner of the licensed practitioner's review of the advanced practice nurse's prescribing practices. The description shall include provisions that the advanced practice nurse must submit documentation of the advanced practice nurse's prescribing practices to the licensed practitioner within seven (7) days. Documentation of prescribing practices shall include, but not be limited to, at least a five percent

(5%) random sampling of the charts and medications prescribed for patients.

(G) A list of all other written practice agreements of the licensed practitioner and the advanced practice nurse.

(H) The duration of the written practice agreement between the licensed practitioner and the advanced practice nurse.

848 I.A.C. 5-1-1(a)(7).

[19] It is evident that the General Assembly has carefully compiled a detailed list of requirements that a collaborative practice agreement must fulfill. It is likewise evident that one of the reasons that our legislature requires nurse practitioners to comply with such rigorous standards is to ensure the safety of patients for whom they will be prescribing legend drugs. In other words, the General Assembly has created statutory mechanisms to ensure that those drugs are provided safely and responsibly, under the oversight of a licensed physician. To put it more plainly, the primary public policy underlying the requirement of collaborative practice agreements is to protect and ensure the safety of the public.

[20] Dr. Collip argues that doctors who enter into a CPA do not owe a duty to the patients of the nurse practitioner. To adopt this position would be to incentivize physicians to put their proverbial blinders on. Not only would they have no incentive to oversee the nurse practitioner's work in a responsible

manner, they would have an incentive *not* to do so.[6] For if they could say, as Dr. Collip argues so strenuously and repeatedly herein, that they did not see the chart of a particular patient who is harmed as a result of alleged malpractice, then they would bear no responsibility whatsoever for the harm befalling that patient. They would feel free to adopt Dr. Collip's approach, which involved entering into eleven to twelve CPAs while also maintaining a 90-hour-per-week medical practice. This result is clearly not what the General Assembly intended when it enacted this legislation.

[21] We can only assume that the legislature did not intend for physicians participating in CPAs to be mere rubber stamps or for physicians to be able to perform their contractual obligations carelessly—or to ignore them altogether—with no consequences. Instead, the General Assembly enacted a statutory scheme ensuring that physicians will provide meaningful oversight, with an apparent end goal of protecting the safety of the public. It is readily apparent that public policy weighs strongly in favor of holding that physicians owe a duty to the nurse practitioner's patients pursuant to a CPA.

[22] According to Dr. Collip, if we hold that doctors have a duty under these circumstances, it would "upset the long-settled relationship between physicians and nurse-practitioners statewide, and could deter physicians from entering or

---

[6] Dr. Collip argues that the incentive to comply with the contract would be the threat of the nurse practitioner enforcing her contractual rights against the physician. It seems ludicrous to expect that a nurse practitioner would bring a lawsuit demanding *greater* supervision by the physician; moreover, we question what damages the nurse practitioner could possibly claim. We do not find this to be a persuasive argument.

continuing such relationships. This outcome would frustrate legislative objectives concerning access to primary health care through the use of independent physician extenders such as nurse-practitioners." Appellant's Br. p. 16-17. We disagree. To put it plainly, we are in no way holding that doctors are the guarantors of the nurse practitioners pursuant to a CPA. We simply hold that doctors have a duty to the patients of the nurse practitioners of reasonable care in fulfilling the doctor's obligations under the CPA. If a doctor complied with his or her review and oversight obligations—for example, if the physician actually reviews the percentage of charts required by the CPA—and sees nothing troubling, and one of the patients is harmed by the negligence of the nurse practitioner, the doctor *has not breached the duty* to that patient.

[23] All three of the *Webb v. Jarvis* factors weigh strongly in favor of the imposition of a duty. Consequently, we hold as a matter of law that a physician who enters into a CPA with a nurse practitioner has a duty of reasonable care to the nurse practitioner's patients in fulfilling his or her obligations under the CPA.

## B. Section 324A

[24] We feel compelled to address the parties' arguments with respect to section 324A of the Restatement (Second) of Torts even though it was not raised at the

trial court.[7] Section 324A of the Restatement (Second) of Torts, which Indiana has adopted, reads as follows:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
>
> > (a)      his failure to exercise reasonable care increases the risk of such harm, or
>
> > (b)      he has undertaken to perform a duty owed by the other to the third person, or
>
> > (c)      the harm is suffered because of reliance of the other or the third person upon the undertaking.

*See Light v. NIPSCO Indus., Inc.*, 747 N.E.2d 73, 75 (Ind. Ct. App. 2001) (observing that "our decisions have equated Indiana law with the provisions of Restatement (Second) of Torts, § 324A"). Section 324A "applies to *any* undertaking to render services resulting in physical harm to third persons where there is negligence in the manner of performance . . . ." *Harper*, 533 N.E.2d at 1262 n.3 (emphasis original).

---

[7] Dr. Collip insists that Mother has waived this argument because she did not raise it before the trial court, but it is well established that "an appellate court reviewing a challenged trial court summary-judgment ruling is restricted neither to the claims and arguments presented at trial nor the rationale of the trial court's ruling." *Carson v. Palombo*, 18 N.E.3d 1036, 1041 (Ind. Ct. App. 2014).

[25]     In this case, Dr. Collip voluntarily undertook to enter into the CPA and perform the duties required by that agreement. Specifically, he undertook a duty to direct and supervise Barger in her practice, including her prescribing practices. He did not undertake this duty gratuitously; he was paid for his services. Dr. Collip acknowledged that the services he agreed to provide under the CPA were necessary for the protection of Barger's patients. Consequently, "[t]here is no question that Dr. Collip's failure to exercise reasonable care in performing his duties under the CPA increased the risk of physical harm to Barger's patients." Appellee's Br. p. 10. Dr. Collip's mere status as a physician does not exempt him from section 324A, because while the Indiana Medical Malpractice Act gives qualified healthcare providers certain privileges, it did not make them immune from the application of Indiana's common law.

[26]     Dr. Collip highlights two recent cases from our Supreme Court that, in his view, require us to rule in his favor. He directs our attention to *Yost v. Wabash College*, in which our Supreme Court held that an actor's liability does not extend beyond the undertaking and that a defendant had not assumed a duty to a third party with respect to the behavior of other actors where "the specific undertaking did not extend to actual oversight and control over the behavior" of the other actors. 3 N.E.3d 509, 521 (Ind. 2014); *see also Smith v. Delta Tau Delta, Inc.*, 9 N.E.3d 154 (Ind. 2014) (holding that because evidence did not establish a duty on the part of the national fraternity to directly supervise and control the actions of the local fraternity and its members, it did not have a duty to ensure the safety of the freshman pledges).

*Yost* and *Smith* require us to define the scope of the undertaking to determine whether there was a duty. Here, the scope of a physician's undertaking when entering into a CPA is to comply with the terms of the contract to protect the safety of the nurse practitioner's patients. In other words, it is readily apparent that Dr. Collip's "specific undertaking" did, in fact, extend to the safety of Barger's patients. We again note that this holding does not render Dr. Collip the guarantor of Barger's medical practices; instead, it merely requires him to fulfill his duty of reasonable care in complying with the CPA. Therefore, whether we analyze the duty question under *Webb v. Jarvis* or under section 324A, the answer is the same—Dr. Collip had a duty to Ratts as a matter of law. We express no opinion as to the remaining elements Mother must prove to prevail on her complaint, as those must be considered by a factfinder.

The judgment of the trial court is affirmed and remanded for further proceedings.

Riley, J., and Bailey, J., concur.